UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

OPEN TEXT CORPORATION,

                Plaintiff,

-against-

ERIC BARROCA, an individual, and NUXEO CORPORATION, a Delaware Corporation

                Defendants.

Case No.

---

## COMPLAINT FOR DAMAGES

Plaintiff, Open Text Corporation ("Open Text") by its attorneys, for its Complaint for Damages against Defendants Eric Barroca ("Barroca") and Nuxeo Corporation ("Nuxeo" and, together with Barroca, "Defendants"), states as follows:

### NATURE OF THE ACTION

1. This action arises out of the systematic raiding and solicitation of key Open Text customers and employees by Nuxeo, Open Text's direct competitor, in an effort to rob Open Text of its top talent and unfairly compete within the Enterprise Information Management and Digital Asset Management software and solutions industry.

2. Specifically, Nuxeo, through Barroca, its Chief Executive Officer, solicited and hired away certain former Open Text employees, including at least Selim Hakimi ("Hakimi") and Matt Corodimas ("Corodimas"), and then directed and induced those former Open Text employees, both before and after their resignations from Open Text became effective, to solicit Open Text's customers, partners and additional employees in breach of their post-employment contractual obligations and fiduciary duties to Open Text.

3. Open Text files the instant action to recover damages stemming from Nuxeo's and Barroca's wrongful conduct and to protect its confidential information, customer and employee relationships, and other legitimate business interests.

## THE PARTIES

4. Open Text is a Canadian corporation with its principal place of business in Waterloo, Ontario, Canada. Open Text conducts business throughout the world and in the United States, including in this District.

5. Open Text is a software company specializing in enterprise information management ("EIM") and consulting services, providing EIM technologies, support and business solutions to organizations around the world. Open Text is also a leader in the Digital Asset Management ("DAM") field. Open Text's innovative DAM solutions help clients manage rich media and videos by serving as a centralized, secure and accessible repository (cloud-based or on-premises) to manage digital media, branding and video.

6. Nuxeo is a Delaware corporation with its principal place of business in New York, New York.

7. Nuxeo is a software company specializing in the provision of enterprise content management ("ECM") and DAM platforms and solutions for organizations around the world. Nuxeo is a direct competitor of Open Text.

8. Barroca is an individual who resides in Brooklyn, New York. Barroca is Nuxeo's Chief Executive Officer.

## JURISDICTION AND VENUE

9. Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(1) because Open Text, Nuxeo and Barroca are citizens of different states and the matter in controversy exceeds the sum of $75,000.

10. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Nuxeo and Barroca are both residents of New York and Barroca resides within this judicial district. Furthermore, a substantial part of the events or omissions giving rise to Open Text's claims occurred within this judicial district.

<u>GENERAL ALLEGATIONS</u>

—OPEN TEXT'S BUSINESS—

11. Open Text is a global software company specializing in EIM products and services, providing EIM technologies, support and business solutions to organizations all over the world. Open Text provides a comprehensive platform and suite of software products and services that assist organizations in finding, utilizing and sharing business information from any device in ways that are intuitive, efficient and productive.

12. Since its founding in 1994 and the creation of its first search engine, Open Text has grown to be one of the global leaders in technology solutions, content management, digital assets management, analytics, discovery and business process management. With the inception of the digital age, one of the biggest problems facing enterprises today is the explosive growth of information volume, collection, formatting, storage and retrieval. Open Text offers solutions to help its customers manage the increasing amount of electronically stored information for which they are responsible.

13. Open Text's solutions help to improve customer satisfaction and digital experience, gain analytical insight, improve collaboration with business partners, address the legal and business requirements associated with information governance, and help to ensure that information remains secure and private, as demanded in today's highly regulated climate.

### —OPEN TEXT'S EMPLOYMENT OF HAKIMI AND CORODIMAS—

14. Prior to their departures for Nuxeo, Open Text employed Hakimi and Corodimas as Senior Account Executives.

15. Hakimi joined Open Text in 2001 and remained employed there for the next 16 years. On or about September 2, 2004, Hakimi executed an Employee Confidentiality and Non-Solicitation Agreement – General with Open Text (the "Hakimi Agreement"). A copy of the Hakimi Agreement is attached hereto as **Exhibit A**.

16. Under the Hakimi Agreement, Hakimi agreed, during his employment with Open Text and for a period of three (3) years thereafter:

> A. to keep confidential and hold in secrecy and not disclose, divulge, publish, reveal or otherwise make known, directly or indirectly, or suffer or permit to be disclosed, divulged, published, revealed or otherwise made known to any person whatsoever, or used (except for the benefit and proper purposes of the Company), and shall faithfully do all in my power to assist the Company in holding in secrecy all of the Company's confidential information as defined above.
>
> B. to keep confidential and hold in secrecy and not disclose, divulge, publish, reveal or otherwise make known, directly or indirectly, or suffer or permit to be disclosed, divulged, published, revealed or otherwise made known to any person whatsoever, or used (except for the benefit and proper purposes of the Company) any and all secrets or confidential information related to the Company's activities or affairs which I now know or which are hereafter disclosed or made known to me or otherwise learned or acquired by me, including information respecting the business affairs, prospects, operations or strategic plans respecting the Company, which knowledge I gain in my capacity as an employee of the Company and which knowledge is not publicly available or disclosed.

(Hakimi Agreement ¶¶ (A)-(B).)

17. Under the Hakimi Agreement, "confidential information" means "all information that is not generally known and which I obtained from the Company, or learn, discover, develop, conceive or create during the term of my employment with the Company, and which relates directly to the business or to assets of the Company." The Hakimi Agreement further defines "confidential information" as follows:

4

> Confidential information includes, but is not limited to inventions, discoveries, know-how, ideas, computer programs, designs, algorithms, processes and structures, product information, research and development information, *lists of clients and other information related thereto*, financial data and information, business plans and processes, and any other information of the Company that the Company informs me, or which I should know by virtue of my position or the circumstances in which I learned it, is to be kept confidential. Confidential information also includes *information obtained by the Company in confidence from its vendors or its clients*. Confidential information may or may not be labeled as "confidential." If I am unsure as to whether information is "confidential," I will ask my manager for assistance.

(*Id.* ¶ I (emphasis added).)

18. The Hakimi Agreement also contains a provision under which Hakimi agreed, during his employment and for a period of six (6) months following the termination of his employment for any reason, not to solicit any Open Text employee or anyone who conducts business with the Company, as follows:

> I will (a) not solicit or entice or attempt to solicit or entice away from the Company any of the employees of the Company to enter into employment or service with any person, business, firm or corporation other than the Company, (b) not solicit or entice or attempt to solicit or entice away from the Company any customer or any other person, firm or corporation dealing with the Company.

(*Id.* ¶ II.)

19. The Hakimi Agreement is governed by the laws of the Province of Ontario, Canada. (*Id.* ¶ V(D).)

20. Corodimas joined Open Text as part of Open Text's 2009 acquisition of Vignette and Corodimas executed an employment agreement with Open Text on or about April 20, 2009.

21. Hakimi and Corodimas were key account managers with direct knowledge about Open Text's DAM customers based in North America. Their focus and specialization was specific to solution selling of Open Text's principal DAM product known as the Media

5

Management Platform, and they managed key accounts, including many existing and prospective Fortune 500 customers.

22. Hakimi and Corodimas were long-term, highly compensated senior Open Text employees, having each earned in excess of $150,000 during their last year of employment at Open Text.

23. Because Hakimi and Corodimas had specialized roles in supporting Open Text's Media Management product, they also had in-depth knowledge about other Open Text opportunities that involved DAM Media Management offerings. Hakimi and Corodimas thus had a broader understanding than many Open Text Account Executives about Open Text's pipeline of sales opportunities.

24. Hakimi and Corodimas worked closely together for many years and worked on ECM and customer experience management ("CEM") sales and solution consulting to Open Text customers and prospective customers throughout North America.

25. As Senior Account Executives, Hakimi and Corodimas also had access to Open Text's Salesforce database. The database contains Open Text's confidential information pertaining to Open Text customers and prospects for which Hakimi and Corodimas were responsible, including customer names, addresses, telephone numbers, e-mail addresses and key contacts; customer contracts; customer license terms; customer orders; customer requirements; customer specific performance metrics; responses to RFXs; and financial information pertaining to customer accounts, including billing statements and historic revenues.

26. Hakimi and Corodimas also developed working relationships with key Open Text solutions consulting and sales personnel. As a result, Hakimi and Corodimas knew which Open Text sales executives were strong performers and who would have the most knowledge of key

Open Text customers, partners and prospects. Because of his specialization on Media Management, Hakimi also knew which Open Text customers and industries Open Text was targeting for DAM opportunities.

27. As senior employees of Open Text, Hakimi and Corodimas owed Open Text certain fiduciary duties, including, but not limited to, a duty of loyalty, a duty to protect, and to not disclose or exploit for their own benefit or for the benefit of others, Open Text's confidential information entrusted to him as an employee of Open Text. These common law duties continued beyond the termination of Hakimi's employment.

—HAKIMI'S AND CORODIMAS' EMPLOYMENT WITH NUXEO—

28. Nuxeo is a software company specializing in the provision of ECM and DAM platforms and solutions for organizations around the world. Nuxeo is a direct competitor of Open Text.

29. Nuxeo markets itself as a "disrupter" in the enterprise and DAM industries, claiming it helps enterprise organizations to transform data into highly valuable digital assets. Specifically, Nuxeo states that it has a flexible data model that can help organizations transform their data into highly valuable assets, with unlimited attributes and no restrictions on type or size of complex objects.

30. Nuxeo's software platforms directly compete with the products and services offered by Open Text, including its Media Manager and Content Server platforms.

31. On January 6, 2017, Corodimas resigned abruptly from his position at Open Text in order to join Nuxeo. From at least January 6, 2017 through his termination by Nuxeo on September 11, 2017, Corodimas worked for Nuxeo in the same or similar capacity as his position at Open Text.

32. On or about March 6, 2017, Hakimi executed an employment agreement with Nuxeo, notwithstanding the fact that he continued working for Open Text until March 28, 2017. Since at least February 2017—more than a month before his resignation from Open Text—until his termination by Nuxeo on September 11, 2017, Hakimi worked for Nuxeo in the same or similar capacity as his position at Open Text.

—BARROCA'S AND NUXEO'S INTERFERENCE AND INDUCEMENT—

33. Beginning in late 2016, Nuxeo began systematically targeting Open Text's high level sales executives and solutions consultants for employment by Nuxeo. In furtherance of its strategy to poach Open Text's "A players," key strategic partners and customers, Nuxeo began using and directing the former Open Text's employees that it had already hired to actively interfere with Open Text's key relationships and to solicit additional Open Text employees, in violation of the former Open Text employees' non-solicitation and other obligations.

34. Specifically, as set forth below, Barroca and other Nuxeo executives actively communicated with Hakimi and Corodimas—both before and after their resignations from Open Text—to induce them to feed Nuxeo confidential information of Open Text relating to Open Text's customers and to solicit other Open Text employees.

35. On or about December 20, 2016, Barroca interviewed Corodimas for a position at Nuxeo.

36. Shortly thereafter, on December 24, 2016, Corodimas exchanged e-mails with Nuxeo's Chief Revenue Officer, Matt Cahir ("Cahir"), in which Corodimas—*while still employed by Open Text*—indicates that he directly texted his contact at Customer A, an Open Text customer, to "let him know where I am," commenting further that "the word is out now."

37. In the same e-mail, Corodimas also identifies, by name, several "key" and "early development" targets, including Open Text's customers and prospects.

8

38. That same day, Cahir forwarded Corodimas' message to Barroca.

39. On January 2, 2017, Cahir e-mailed Barroca that he and several others from Nuxeo planned to fly to California that week to meet Corodimas to "develop a plan around current opportunities [and] new opportunities that Matt [Corodimas] is bringing . . ." On information and belief, those meetings/discussions took place between January 3 and January 5, 2017, prior to Corodimas' resignation from Open Text on January 6, 2017.

40. On January 17 and 19, 2017, Danny Patrick of Stott & May Professional Search, Ltd. ("Stott & May"), an executive search recruitment agency, e-mailed Hakimi trying to recruit him to work at Nuxeo, and stated that Hakimi came highly recommended by a former colleague.

41. Upon information and belief, Corodimas is the former colleague who recommended Hakimi to Nuxeo to solicit for employment.

42. On February 14, 2017, Hakimi received an offer of employment from Nuxeo. He did not, however, execute an agreement with Nuxeo until March 6, 2017, and he did not announce his resignation from Open Text until March 17, 2017 (effective March 31, 2017). Instead, Hakimi worked behind the scenes at Barroca's and Nuxeo's behest to solicit Open Text customers and prospects and steal Open Text confidential information.

43. On February 22, 2017, before Hakimi had resigned and while he was *still employed by Open Text*, Barroca e-mailed Hakimi at his personal e-mail address asking him for the contact information for his "presales guy."

44. Hakimi responded to Barroca the next day and provided Barroca with Open Text employee Neil Grant's ("Grant") contact information. Barroca immediately directed a Nuxeo employee to draft an offer letter to Grant. Less than three weeks later, Grant resigned from Open Text to work for Nuxeo in the same position he held at Open Text. Grant, like Hakimi, also was

subject to a post-employment confidentiality and customer non-solicitation agreement with Open Text.

45. Between February 22 and February 24, 2017, while Hakimi was still employed as an Open Text Senior Account Manager, Barroca and Hakimi had extended e-mail discussions about pitching business on behalf of Nuxeo to Customer B, an Open Text customer for whom Hakimi had drafted Open Text's most recent DAM proposal.

46. Knowing full well that Hakimi was still employed by Open Text, Barroca e-mailed Hakimi at his personal e-mail address asking Hakimi whether he had heard "any feedback" from Customer B following a recent Nuxeo presentation. Customer B is a current Open Text customer. Hakimi responded that he plans to meet with the boss of his contact at Customer B the following week. When Barroca responded that he is unsure Customer B has "enough drive/pain to make the switch," Hakimi responded, "[w]e will get them, its just a matter of now or end of the year!"

47. That same day, Matt Cahir separately e-mailed Hakimi and asked him to identify where Nuxeo "should be focused in Europe, Customers, Partners, People . . ." and noted that "any help would be great."

48. Four days later, Hakimi e-mailed notes from an internal Open Text planning call regarding Open Text Customer C to himself at his personal e-mail account.

49. On March 3, 2017, Nuxeo held an internal sales meeting, at which the group discussed that Hakimi would be: (a) setting up a meeting regarding Customer D; (b) "handling" Customer E; and (c) making an introduction to Customer F. Customers D, E and F were all Open Text customers and Hakimi was employed by Open Text as of that date. A Nuxeo

employee e-mailed minutes of the sales meeting to Barroca at his Nuxeo e-mail address the same day.

50. Also on March 3, Barroca interviewed Open Text employee Steve Grimes ("Grimes") at Nuxeo's office in New York. Grimes was Open Text's current North America Director of Solutions Consulting. A few weeks later, Grimes resigned from Open Text. Before his resignation, Grimes downloaded thousands of proprietary and confidential Open Text documents relating to Open Text DAM and Enterprise strategies.[1]

51. On March 6, 2017, Hakimi signed an employment agreement with Nuxeo, which is dated February 14, 2017.

52. On March 10, 2017, Open Text sent Customer F a highly confidential pricing proposal and scope of work proposal for Open Text's DAM strategy. Hakimi, who was part of the Customer F sales team, was copied on Open Text's proposal. Less than two weeks later, Nuxeo sent a DAM proposal to Customer F that undercut Open Text's pricing to Customer F.

53. On March 16, 2017, Hakimi, using a Nuxeo e-mail address—but while *still employed by Open Text*—e-mailed Open Text Customer G and requested a meeting to discuss the Nuxeo platform "before you make your final decision" to build the Customer G custom solution with Open Text. When Customer G's representative responded that he would be willing to have a conversation, he warned that "there is nothing that is going to change [its] mind this year," Hakimi forwarded the exchange to Cahir, noting, "I'll see what I can do with him." Cahir then forwarded the e-mail chain on to Barroca.

54. The next day, March 17, 2017, Hakimi announced his resignation from Open Text effective March 31, 2017. Hakimi falsely informed Open Text that he needed to "take care of

---

[1] Open Text has sued Grimes, a resident of Maryland, and Nuxeo in the United States District Court for the District of Maryland in an action styled *Open Text v. Grimes and Nuxeo*, Case No. 17-cv-1248.

11

some personal situations." Hakimi also stated that Grant's departure was one of the reasons prompting Hakimi's decision, and that he had spent "weeks trying to convince Neil [Grant] to stay on." This statement was also false given that Nuxeo hired Grant at Hakimi's suggestion, which Hakimi provided directly to Barroca in response to Barroca's request.

55. The same date he announced his resignation, Hakimi e-mailed confidential Open Text information relating to two other Open Text customers, Customer C and Customer H, to himself at his personal Gmail address. Hakimi later forwarded this information to Nuxeo Chief Information Officer, Theiry Delprat, and his own Nuxeo e-mail address.

56. On March 23, 2017, Nuxeo held an internal sales meeting, which Hakimi attended while still an Open Text employee, and at which the group again discussed the accounts of Open Text Customers D, E and F, as well as Customer I. Specifically, Hakimi indicated, among other things, that his call with Customer F went well and that an RFP for Customer D was due in 10-14 days. Again, the notes of this sales meeting were forwarded to Barroca the same day.

57. Barroca expressed no concern that an employee of Nuxeo's competitor Open Text had attended a Nuxeo sales meeting to discuss soliciting Open Text's customers.

58. On March 24, 2017, Nuxeo created a DAM proposal for Customer F that indicated it was "Prepared by Sal Hakimi, Nuxeo Corporation," despite that Hakimi's resignation from Open Text would not be effective for another week.

59. On March 26, 2017, Hakimi confirmed—from his Nuxeo e-mail address but while employed by Open Text—that the Nuxeo proposal for Customer F was "in the customer's hands" and that he and others at Nuxeo were presenting to Customer F the following day. None of Hakimi, Barroca or Nuxeo informed Customer F, and Customer F did not know, that Hakimi was still employed by Open Text at the time.

60. On April 10, 2017, Nuxeo created a DAM proposal to Customer J that indicated it was "prepared by Sal Hakimi," Nuxeo Corporation. Before he resigned from Open Text, Hakimi helped prepare an Open Text DAM proposal for Customer J.

61. On April 24, 2017, Hakimi received an e-mail from an Open Text employee attaching screenshots of the workflow experience they were building at Open Text and information relating to Open Text's RFP response for Customer D. Hakimi sent this information to the Nuxeo team (including several former Open Text employees) and they discussed implementing Open Text workflows into Nuxeo's workflow.[2]

62. Customers D, F, I and J declined to give their business to Open Text. Upon information and belief, Customers D and J have selected Nuxeo as their DAM vendor. Collectively, the revenue Open Text would have generated from the Customer D and J accounts exceeds $75,000.

**COUNT I**
**(AIDING AND ABETTING BREACH OF FIDUCIARY DUTY – BARROCA AND NUXEO)**

63. Open Text restates and realleges Paragraphs 1 through 62 as and for this Paragraph 63 of Count I.

64. By virtue of their employment with Open Text, Hakimi and Corodimas owed Open Text certain fiduciary duties, including, but not limited to, a duty of loyalty, a duty to protect, and to not disclose or exploit for their own benefit or for the benefit of others, Open Text's confidential information entrusted to him as an employee of Open Text. These common law duties continued beyond the termination of Hakimi's employment.

65. Barroca and Nuxeo were aware of and had reason to know of the fiduciary duties and duties of loyalty Hakimi and Corodimas owed to Open Text.

---

[2] Open Text has sued Hakimi, a resident of New Jersey, and Nuxeo in the United States District Court for the District of New Jersey in an action styled *Open Text v. Hakimi and Nuxeo*, Case No. 17-cv-3196.

66. On behalf of Nuxeo, Barroca knowingly and intentionally committed acts that induced, encouraged, aided and abetted and/or participated in conduct that caused Hakimi and Corodimas to breach their fiduciary duties and duties of loyalty to Open Text by inducing and/or directing them to: (i) retain and disclose to Nuxeo Open Text confidential information for Nuxeo's use, benefit and competition; (ii) solicit additional Open Text employees; and (iii) solicit Open Text customers and prospective customers.

67. The breaches of fiduciary duties by Hakimi and Corodimas, together with the tortious inducement and participation of Barroca and Nuxeo, have proximately caused Open Text substantial damage.

68. The foregoing tortious conduct by Barroca and Nuxeo was knowing, intentional and of such an aggravated character as to warrant the imposition of punitive damages.

WHEREFORE, Open Text respectfully requests that this Court enter judgment in its favor on Count I and award the following relief:

(a) Compensatory damages in an amount to be determined at trial, but no less than $75,000;

(b) Disgorgement of any profits or other benefits received by Barroca and/or Nuxeo as a direct and proximate result of its aiding and abetting in Hakimi's and Corodimas' breaches of their fiduciary duties and duties of loyalty to Open Text;

(c) Punitive damages in an amount to be determined at trial; and

(d) Such other and further relief as this Court deems just and proper.

**COUNT II**
**(TORTIOUS INTERFERENCE WITH CONTRACT – BARROCA AND NUXEO)**

69. Open Text restates and realleges Paragraphs 1 through 68 as and for this Paragraph 69 of Count II.

70. At all relevant times, Open Text had a valid and enforceable contractual relationship with Hakimi pursuant to the Hakimi Agreement.

71. Upon information and belief, Barroca and Nuxeo were aware of and had reason to know that Hakimi, as a former employee of Open Text, was subject to certain confidentiality obligations and restrictive covenants set forth in the Hakimi Agreement.

72. Upon information and belief, Barroca, on behalf of Nuxeo, knowingly, intentionally and purposefully participated in conduct that interfered with and caused breaches of Hakimi's commitments and obligations under the Hakimi Agreement by, among other things:

    (a) Inducing and/or directing Hakimi to use Open Text confidential information to solicit Open Text's customers on behalf of Nuxeo;

    (b) Inducing and/or directing Hakimi to solicit and recruit Open Text's employees on behalf of Nuxeo;

    (c) Inducing and/or directing Hakimi to solicit Open Text customers and prospective customers on behalf of Nuxeo.

73. Barroca and Nuxeo had no justification or excuse to interfere with Open Text's contractual relationship with Hakimi.

74. Barroca's tortious interference, on behalf of Nuxeo, has directly and proximately caused Open Text substantial damage, including to its confidential information, its existing and prospective customer and partner relationships, competitive advantage and good will, all of which Open Text has expended significant time, money and effort to develop and secure.

75. Barroca's misconduct, on behalf of Nuxeo, was and is knowing, intentional and reckless, and is of such an aggravated character as to warrant the imposition of punitive damages.

WHEREFORE, Open Text respectfully requests that this Court enter judgment in its favor on Count II and award the following relief:

      (a)      Compensatory damages in an amount to be determined at trial, but no less than $75,000;

      (b)      Punitive damages in an amount to be determined at trial; and

      (c)      Such other and further relief as this Court deems just and proper.

## COUNT III
### (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS – BARROCA AND NUXEO)

76.    Open Text restates and realleges Paragraphs 1 through 75 as and for this Paragraph 76 of Count III.

77.    At all relevant times, Open Text had established ongoing business relationships with various businesses that utilized Open Text's services to the benefit of Open Text, including, but not limited to, Customers A through J referenced above.

78.    Barroca and Nuxeo were aware of and had reason to know about these ongoing business relationships as a result of Nuxeo's hiring of Hakimi, Corodimas and various other former Open Text employees. The conduct of Barroca, on behalf of Nuxeo, as described above, was designed to, and, in fact, did, intentionally interfere with the same through improper and/or illegal means.

79.    Barroca and Nuxeo's interference has directly and proximately caused Open Text substantial damage, including to its business relationships with Customers A through J.

WHEREFORE, Open Text respectfully requests that this Court enter judgment in its favor on Count III and award the following relief:

      (a)      Compensatory damages in an amount to be determined at trial, but no less than $75,000;

      (b)      Punitive damages in an amount to be determined at trial; and

      (c)      Such other and further relief as this Court deems just and proper.

        Respectfully submitted,

        OPEN TEXT CORPORATION

        By:    s/ Joshua Dunn
                One of Its Attorneys

Joshua A. Dunn
Vedder Price P.C.
1633 Broadway, 31st Floor
New York, New York 10019
T: +1 212 407 7700

Dated: October 2, 2017